1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN MALDONADO,

Plaintiff,

v.

J. ASHBY,

Defendant.

Case No. 21-cv-07780 BLF (PR)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

(Docket No. 18)

Plaintiff, a state prisoner proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 against a physician at the Correctional Training Facility ("CTF") in Soledad. Dkt. No. 1.[1] The Court found the complaint stated a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs against Defendant Dr. Jonathan Ashby. Dkt. No. 9 at 3. Defendant filed a motion for summary judgment on the grounds that Plaintiff cannot meet his burden of proving deliberate indifference to serious medical needs, Defendant is entitled to qualified immunity, and Plaintiff is not entitled to punitive damages. Dkt. No. 18. In support, Defendant filed declarations and

---

[1] All page references herein are to the Docket pages shown in the header to each document and brief cited, unless otherwise indicated.

exhibits.[2]  *Id.*  Plaintiff filed opposition, supported by his declaration (Ex. A).  Dkt. No. 25.[3]  Defendant filed a reply.  Dkt. No. 28.

Plaintiff also submitted declarations from three other inmates, each criticizing the care they claim to have received from Defendant.  Dkt. No. 25, Exs. D, E.  Defendant objects to these declarations as irrelevant because they refer to medical conditions that are not at issue here, *i.e.*, pain in the ears, throat, and knee, and Defendant's alleged treatment of these inmates' medical needs does not pertain to the claim that Defendant was deliberately indifferent to *Plaintiff's* needs.  Dkt. No. 28 at 4.  The Court agrees that these declarations contain no relevant information regarding the treatment provided by Defendant to Plaintiff.  Therefore, those irrelevant portions of the declarations will not be considered.[4]  *See* Fed. R. Evid. 402.

For the reasons set forth below, Defendant's motion for summary judgment is **GRANTED**.

## DISCUSSION

I.  <u>Statement of Facts</u>[5]

Plaintiff alleges Defendant Ashby, a physician employed at CTF, failed to provide constitutionally adequate medical care for Plaintiff's nosebleed condition, also known as

---

[2] Defendant submits his declaration, Dkt. No. 18-4, along with exhibits containing excerpts from Plaintiff's medical records of which he has personal knowledge, Dkt. No. 18-5, and the declaration of Dr. B. Feinberg, Chief Medical Consultant for the California Correctional Health Care Services ("CCHCS") Office of Legal Affairs, Dkt. No. 18-6, with exhibits containing copies of Plaintiff's medical records, Dkt. No. 18-7.  Defendant also submits the declaration of counsel, C. Hay-Mie Cho, Dkt. No. 18-2, along with an exhibit containing excerpts from the transcript of Plaintiff's deposition taken on September 8, 2022, Dkt. No. 18-3.

[4] Plaintiff's cellmate, Inmate Rivas, also states that he saw Plaintiff have reoccurring nosebleeds from March through August 2020.  Rivas Decl. ¶ 2, Dkt. No. 25 at 29.  Accordingly, this part of the declaration is relevant as corroborating Plaintiff's allegation that he continued to have nosebleeds during that time period.  *See infra* at 6-7.

[5] The following facts are not disputed unless otherwise stated.

epistaxis.  Dkt. No. 1 at 3-4; Dkt. No. 18 at 7.  Defendant was Plaintiff's primary care physician ("PCP") at CTF.  Dkt. No. 1 at 4.

The parties disagree about the date Defendant first treated Plaintiff for the nosebleed condition.  Plaintiff alleges his nosebleeds commenced on March 10, 2020, for "several times per week."  Dkt. No. 1 at 3 ¶¶ 1, 2; *see also* Maldonado Decl. ¶ 2, Dkt. No. 25 at 13 (Plaintiff states he had severe nosebleeds "[b]etween March and October 2020").  According to Plaintiff, he first consulted Defendant for nosebleeds on March 30, 2020.  Dkt. No. 1 at 4 ¶ 3.  At that visit, Plaintiff alleges Defendant made a "quick examination" and then instructed Plaintiff to go back to his cell and "drink a lot of water to stop the bleeding."  Maldonado Decl. ¶ 4, Dkt. No. 25 at 13.  Plaintiff further declares that Defendant "expressed to me, that if the bleeding [] continued, he is going to refer the case to a specialist, because he is not a specialist in treating this kind of condition."  *Id.*; *see also* Dkt. No. 1 at 4 (complaint alleges Defendant acknowledged he did not have experience with epistaxis and indicated he would refer Plaintiff to a specialist, yet Defendant delayed making the referral for a period of months).  At his deposition, Plaintiff was unable to produce documentation showing a consultation with Defendant on March 30, 2020.  Maldonado Dep. at 23:3-25, Dkt. No. 18-3 at 6.

There is no dispute that Defendant provided medical care for Plaintiff's nosebleeds on April 23, 2020, which Defendant maintains was the date he first treated Plaintiff for a nosebleed.  Ashby Decl. ¶ 5, Dkt. No. 18-4 at 2.  Dr. B. Feinberg attests that he reviewed Plaintiff's complaint and his medical records from November 1, 2019 to September 30, 2022.  Feinberg Decl. ¶¶ 8, 10, Dkt. No. 18-6 at 3.  According to Dr. Feinberg, "the first episode of epistaxis documented in the medical record occurred on April 23, 2020," when Plaintiff "complained of dizziness and a bloody nose."  *Id.*  According to his medical records, custodial staff saw Plaintiff for a nosebleed for the first time on April 23, 2020.  Maldonado Dep. at Ex. C, Dkt. No. 18-3 at 34 (Progress Note), 36 (Plaintiff's Request for Services dated April 23, 2010); Ashby Decl. at Ex. A, Dkt. No. 18-5 at 5 (same Progress

3

Note), at 7 (same Request for Services).  Plaintiff was taken to the prison's Treatment and Triage Area (TTA), where the bleeding continued.  Maldonado Dep. at Ex. C, Dkt. No. 18-3 at 35; Ashby Decl. at Ex. A, Dkt. No. 18-5 at 5.

Defendant did not personally visit with Plaintiff on April 23, 2020.  Rather, a nurse advised Defendant over the phone that Plaintiff's nosebleed continued even after 20 minutes of leaning forward with direct pressure and an ice pack on his nose.  Ashby Decl. ¶ 5, Dkt. No. 18-4 at 2.  Defendant ordered transport of Plaintiff to an off-site facility, the Natividad Medical Center ("NMC").  *Id.*; Maldonado Dep. at 45:11-19 and Ex. C, Dkt. No. 18-3 at 11, 31, 35; Ashby Decl. ¶ 5, Dkt. No. 18-4 at 2; Feinberg Decl. ¶¶ 10-11, Dkt. No. 18-6 at 3-4.  Plaintiff denies that it was Defendant who made the referral to NMC, and declares it was custody staff who referred him to NMC.  Maldonado Decl. ¶ 5, Dkt. No. 25 at 13.  Defendant attests that he gave the transport orders, which is supported by his progress notes; Defendant also called the emergency department at NMC to accept the transfer.  Ashby Decl. ¶ 5, Dkt. No. 18-4; Feinberg Decl. ¶ 10, Dkt. No. 18-6 at 4.

The ambulance personnel who transported Plaintiff positioned a clamp to stop the bleeding.  Maldonado Dep. at 45:22-25, Dkt. No. 18-3 at 11, 12.  NMC staff removed the clamp.  *Id.* at 45:25-46:1.  The bleeding did not resume after several hours.  *Id.* at 46:1-2.  NMC staff did a visual check of Plaintiff's nose with a light but did not insert a camera.  *Id.* at 46:6-8.  NMC staff also gave Plaintiff a spray.  *Id.* at 47:1-7.  According to Plaintiff, the spray did not work and he was not allowed to bring the spray into the prison.  *Id.* at 47:5-9, 48:1-6; *see also* Feinberg Decl. ¶ 11, Dkt. No. 18-6 at 4 (Dr. Feinberg declares that NMC recommended Plaintiff apply Vaseline daily and direct pressure if bleeding recurred, also CTF nursing staff provided discharge instructions and a handout on nosebleeds on Plaintiff's return).  Plaintiff also states that NMC did not do the sort of advanced treatment that was ultimately necessary to stop the bleeding.  Maldonado Dep. at 48:7-14, Dkt. No. 18-3 at 14.  According to Plaintiff, the NMC physician informed Plaintiff that he needed to return to the hospital for follow-up care.  Maldonado Decl. ¶ 6, Dkt. No. 25 at 13.  Such an

United States District Court
Northern District of California

1   order is not indicated in the medical records, and neither Defendant nor Dr. Feinberg

2   mentions any such plan or recommendation.  Ashby Decl. ¶ 6, Dkt. No. 18-4 at 2-3;

3   Feinberg Decl. ¶ 11, Dkt. No. 18-6 at 4.

4       The medical records indicate that Plaintiff was seen by a nurse the next day, April

5   24, 2020.  Dkt. No. 18-3 at 38; Feinberg Decl. ¶ 12, Dkt. No. 18-6 at 4.  Plaintiff informed

6   the nurse he had no further nosebleeds.  *Id*.  Plaintiff was instructed to notify medical of

7   any recurrence; he did not report any as of April 28, 2020, when Defendant entered a note

8   summarizing what had transpired with regards to Plaintiff's most recent nosebleed.  *Id.*;

9   Feinberg Decl. ¶ 13, Dkt. No. 18-6 at 4.

10      On May 4, 2020, Plaintiff had an office visit with Defendant.  Maldonado Dep. at

11  Ex. D, Dkt. No. 18-3 at 37 (Progress Note indicates visit with Defendant); Maldonado

12  Dep., Dkt. No. 18-3 at 15, 19; Ashby Decl. ¶ 7, Dkt. No. 18-4 at 3; *id.* at Ex. B, Dkt. No.

13  18-5 at 9-10 (medical record of the May 4, 2020 office visit).  According to Defendant,

14  Plaintiff stated he had experienced no further bleeding and was playing sports.  Ashby

15  Decl. ¶ 7, Dkt. No. 18-4 at 3.  Defendant "did not observe any vessels or any other location

16  where bleeding was possible."  *Id.*  Defendant wrote in the Progress Note of the visit,

17  "Today [Plaintiff] states he has had no further bleeding.  He has been active with sports

18  and exercises."  Ashby Decl. at Ex. B, Dkt. No. 18-5 at 9; Maldonado Dep., Ex. D, Dkt.

19  No. 18-3 at 37.  Defendant marked the issue "Resolved," and gave Plaintiff instructions

20  how to control bleeding should the problem return.  Maldonado Dep., Ex. D, Dkt. No. 18-3

21  at 38; Ashby Decl. ¶ 7, Dkt. No. 18-4 at 3; *id.* at Ex. B, Dkt. No. 18-5 at 10; *see also*

22  Feinberg Decl. ¶ 14, Dkt. No. 18-6 at 4 (regarding record of May 4, 2020 office visit).

23      Plaintiff denies that he reported an end to the nosebleeds at the May 4, 2020 office

24  visit.  Maldonado Dep. at 54:23-25, Dkt. No. 18-3 at 19.  At deposition, Plaintiff

25  maintained that Defendant's note in the medical records merely indicates Plaintiff was not

26  bleeding at the time of the office visit.  *Id.*; *id.* at 55:1-18, Dkt. No. 18-3 at 19-20.  Plaintiff

27  acknowledged telling Defendant only "that I wasn't bleeding [] at that moment.  He wrote

28

United States District Court
Northern District of California

down that from his viewpoint I was okay, but in reality, I was not okay." *Id.* at 55:15-17. Plaintiff agrees Defendant showed him how to squeeze his nose in the event of bleeding. *Id.* at 56:6-7. Plaintiff claims that during this appointment, he asked for a referral to a specialist and that Defendant agreed to make a referral. *Id.* at 53:21-25. According to Plaintiff, Defendant advised that in the meantime, Plaintiff should get some water when he had nosebleeds. *Id.* at 54:1-6. According to Defendant, he denies assessing a need for specialist care on May 4, 2020. Ashby Decl. ¶ 11, Dkt. No. 18-4 at 4.

According to Plaintiff, the bleeding continued after his visit to NMC; he had nosebleeds 3 to 5 times daily, mostly at night. Maldonado Decl. ¶¶ 7, 8, Dkt. No. 25 at 13; *see also* Dkt. No. 1 at 4 ¶ 4. Plaintiff states the nosebleeds blocked his nose, interrupted his breathing and oxygen supply, and caused lack of sleep and frequent vomiting for several months. Maldonado Decl. ¶ 7, Dkt. No. 25 at 13; *see also* Maldonado Dep. at 54:1-6, Dkt. No. 18-3 at 19. Plaintiff's cellmate (Rivas) attests that generally from March through August 2020, he observed Plaintiff experiencing nosebleeds, as often as 3 to 5 times per day and at night. Rivas Decl. ¶ 2, Dkt. No. 25 at 29. He also could hear Plaintiff experiencing breathing problems while sleeping. *Id.*

According to Plaintiff, he made several requests to see Defendant "but for many weeks I was not able to see him." Maldonado Decl. ¶ 7, Dkt. No. 25 at 13. Plaintiff also declares he did not call for medical attention for "several nosebleeds which occurred mostly at night time" between May and September 2020 "because Dr. Ashby is not working at night at the prison grounds." *Id.* at ¶ 8, Dkt. No. 25 at 13-14. Plaintiff further declares he had "several appointments" with Defendant during the May to September 2020 time frame, but these appointments were "unrelated to my nosebleed." *Id.* at ¶ 9, Dkt. No. 25 at 14. According to Plaintiff, on more than one occasion he "verbally reported to Dr. Ashby that my nose was bleeding at night time," and that "Dr. Ashby's response to my complaint was I don't see active blood right now, but i[f] this happen[s] again just drink a lot of water." *Id.*

6

On the other hand, Plaintiff's medical records contain no complaints of nosebleeds in the three-month interval between May 4, 2020 and August 4, 2020.  His next documented complaint of nosebleed or request for medical attention for a nosebleed occurred on August 4, 2020.  Feinberg Decl. ¶¶ 14, 15, Dkt. No. 18-6 at 4-5.  On that date, Plaintiff submitted a Health Services Request Form in which he asked for a visit with the doctor because of "a lot of back pain," and "also sometimes I have been bl[ee]ding for my nose so I would like to be check[ed] A.S.A.P."  Dkt. No. 25 at 38 (Ex. F); Feinberg Decl. Dkt. ¶ 15, No. 18-6 at 5; *see also* Maldonado Dep. at 59:6-11, Dkt. No. 18-3 at 21-22 (referring to an appointment on August 4, 2020, which, however, appears to be a mis-stated date, and actually part of a continued discussion of Plaintiff's May 4, 2020 appointment).

Plaintiff's August 4, 2020 request was triaged on August 5, 2020.  Dkt. No. 25 at 38 (Ex. F).  On August 6, 2020, a nurse (Ansari) examined Plaintiff's nostrils and determined they appeared normal.  Feinberg Decl. ¶ 16, Dkt. No. 18-6 at 5.  The nurse instructed Plaintiff to apply Vaseline.  *Id.*  The nurse did not contact Defendant.  *Id.*

Plaintiff's medical records show he received medical attention for his nosebleed condition on August 15, 2020.  It is unclear exactly how this came about.  One entry in Plaintiff's medical records indicates that custody found Plaintiff with a bleeding nose and were instructed to bring Plaintiff to the TTA, which Plaintiff refers to as the prison's "central hospital."  Maldonado Dep., Exs. C & D, Dkt. No. 18-3 at 34, 39; Maldonado Dep. at 59:12-17, 60:22-24, Dkt. No. 18-3 at 22-23.  On the other hand, there is a Health Services Request Form dated August 15, 2020, in which Plaintiff complained of having pain in his low back and "a lot of nosebleeding problems."  Dkt. No. 25 at 39.  Plaintiff stated he "would like to be seen A.S.A.P. thank you I bleed 3 times on one day and that is not normal."  *Id.*  His request was triaged the same day, August 15, 2020.  *Id.*; *see also id.* at 40 (Plaintiff's inmate pass to TTA dated August 15, 2020).

Regardless how the August 15, 2020 visit to the TTA was arranged, Plaintiff's nose was not bleeding when he arrived at the TTA.  Maldonado Dep. at Ex. C, Dkt. No. 18-3 at 34; Ashby Decl. ¶ 8, Dkt. No. 18-4 at 3.  In his deposition, Plaintiff disputes whether his nosebleed had stopped:

> … you know how long a distance is between Lassen where I was staying and the central hospital?
>
> They made me walk that whole distance, and all the while, I was bleeding.  I had a towel which I was pressing on my nose to cover it.  I was bleeding, covering my nose.  So how it is that they could say I was not bleeding?

Maldonado Dep. at 61:18-25, Dkt. No. 18-3 at 24.  A nurse (Coleman) instructed Plaintiff to pinch and pack his nose if it bled and to notify medical staff.  Feinberg Decl. ¶ 17, Dkt. No. 18-6 at 5; *id.* Ex. B at AGO 039, Dkt. No. 18-7 at 42.  Plaintiff was scheduled for a nurse follow-up wellness check on August 17, 2020.  Feinberg Decl. ¶ 17, Dkt. No. 18-6 at 5.

At the follow-up on August 17, 2020, the nurse (Ansari) determined that Plaintiff's nose was not bleeding and his nostrils were normal.  Feinberg Decl. ¶ 18, Dkt. No. 18-6 at 5; *id.*, Ex. B at AGO 037 – AGO 044, Dkt. No. 18-7 at 40-47.  The nurse informed Defendant, who ordered blood tests and requested that Plaintiff be scheduled for an in-person visit within 14 days.  Feinberg Decl. ¶ 18, Dkt. No. 18-6 at 5.

The following day on August 18, 2020, Plaintiff returned to the TTA with another active nosebleed.  Ashby Decl. ¶ 8, Dkt. No. 18-4 at 3; Feinberg Decl. ¶ 19, Dkt. No. 18-6 at 5.  Plaintiff was seen by a nurse who spoke with the on-call physician, Dr. Grotke.  *Id.*; Maldonado Dep. at 69:4-7, Dkt. No. 18-3 at 26.  The nurse reported to Dr. Grotke that Plaintiff had "active but mild bleeding from one nostril."  Feinberg Decl. ¶ 19, Dkt. No. 18-6 at 5.  Dr. Grotke ordered additional blood tests, switched Plaintiff's ibuprofen medication to Tylenol, and confirmed that Plaintiff should see his PCP (*i.e.*, Defendant) within 14 days.  *Id.*; Ashby Decl. ¶ 8, Dkt. No. 18-4 at 3.

United States District Court
Northern District of California

On August 19, 2020, Defendant sent Plaintiff a letter with blood test results showing that Plaintiff did not have anemia.  Feinberg Decl. ¶ 20, Dkt. No. 18-6 at 6.  On the same day and again on August 26, 2020, Plaintiff submitted Health Services Request Forms in which he sought medical attention for nosebleeds and claimed to have been vomiting and experiencing shortness of breath.  Dkt. No. 25 at 42, 43.

On September 1, 2020, Plaintiff had an appointment with Defendant to follow-up the nosebleed events that had occurred beginning August 15, 2020.  Maldonado Dep. at 69:8-16, Dkt. No. 18-3 at 26; Ashby Decl. ¶ 8, Dkt. No. 18-4 at 3.  The parties dispute whether Defendant examined Plaintiff.  Plaintiff maintains a nurse examined him and reported to the doctor.  Maldonado Dep. at 69:8-25, Dkt. No. 18-3 at 26.  Defendant maintains he personally examined Plaintiff and found Plaintiff's airways were dry.  Ashby Decl. ¶ 9, Dkt. No. 18-4 at 3; *see also* Feinberg Decl. ¶ 21, Dkt. No. 18-6 at 6 (Dr. Feinberg confirms medical records show Plaintiff saw Defendant on September 1, 2020).  Defendant gave instructions to apply lubricants to keep the nose moist, to avoid certain breathing techniques that increase blood pressure, and to avoid nasal sprays.  Ashby Decl. ¶ 9, Dkt. No. 18-4 at 3.

Plaintiff submitted two more Health Services Request Forms, dated September 5, 2020, and September 10, 2020, in which he requested to see the doctor because of issues with his nose and his back.  Dkt. No. 25 at 44, 45; *id.* at 45 (September 10, 2020 Request complaining of "frequent nosebleeds more often").  Nurse Ansari responded to both requests.  Feinberg Decl. ¶¶ 23, 25; Dkt. No. 18-6 at 6.  Plaintiff was not bleeding on either occasion.  *Id.*  Nurse Ansari instructed Plaintiff how to stop nosebleeds, and Plaintiff demonstrated he understood the techniques.  *Id.*  Nurse Ansari did not contact Defendant but planned to bundle the bleeding concern into an upcoming scheduled appointment with Defendant.  *Id.*

On September 22, 2020, Plaintiff had an appointment with Defendant.  Ashby Decl. ¶ 10, Dkt. No. 18-4 at 3; Feinberg Decl. ¶ 26, Dkt. No. 18-6 at 7.  Plaintiff reported

nosebleeds which he controlled by pinching his nose, and that he had stopped using the lubricants because they were clogging his nose.  Ashby Decl. ¶ 11, Dkt. No. 18-4 at 3-4. Defendant "examined Plaintiff's airways again and saw no scabs or protruding vessels." *Id*.  Defendant gave Plaintiff a nasal spray.  *Id*.  Plaintiff requested a specialist referral.  *Id*. Defendant made the referral but did not mark it urgent as of September 22, 2020.  *Id.* at ¶¶ 11, 12; *see also* Feinberg Decl. ¶ 26, Dkt. No. 18-6 at 7 (Dr. Feinberg declares the request was approved by Defendant's supervisor on September 24, 2020).  Defendant declares that he had not previously believed a specialist referral was medically necessary.  Ashby Decl. ¶ 11, Dkt. No. 18-4 at 4.  Plaintiff alleges, without evidentiary support, that Defendant did not make the specialist referral until October 10, 2020.  Dkt. No. 1 at 4-5 ¶ 6.

On September 29, 2020, Plaintiff submitted a final Health Services Request Form, asking to see the doctor because "I am bleeding more!  The spray is not working I need to see the specialist for the nose problem."  Dkt. No. 25 at 46; Maldonado Dep. at 84:6-7, Dkt. No. 18-3 at 27; Feinberg Decl. ¶ 27, Dkt. No. 18-6 at 7.  Nurse Ansari responded to the Request on October 1, 2020.  Feinberg Decl. ¶ 28, Dkt. No. 18-6 at 7.  At that time, Plaintiff's nose was not bleeding, and his nostrils appeared normal.  *Id.*  Nurse Ansari informed Plaintiff he had already been referred to a specialist.  *Id.*  Nurse Ansari did not contact Defendant about this visit.  *Id.*

The evening of October 2, 2020, a nurse in the TTA contacted the on-call physician – this time, Dr. Silva – to report that "Plaintiff presented with active nose bleeding that resolved with the application of pressure and an ice pack."  *Id.* at 7 ¶ 29.  Dr. Silva planned for Plaintiff to follow-up with Defendant on Monday October 5, 2020, although apparently the actual date of Plaintiff's scheduled appointment was October 7, 2020.  *Id.*; Maldonado Dep. at 84:6-7, Dkt. No. 18-3 at 27 (scheduled appointment was for "10/7").

At the scheduled appointment on October 7, 2020, Plaintiff reported to Defendant that the bleeding continued to occur at night.  Ashby Decl. ¶ 11, Dkt. No. 18-4 at 4; Feinberg Decl. ¶ 31, Dkt. No. 18-6 at 8.  Plaintiff was able to control the bleeding by

United States District Court
Northern District of California

leaning forward and pinching.  *Id.* (Plaintiff's medical records indicate he reported the technique for stopping bleeding "has worked each time").  Defendant examined Plaintiff's nasal airways "but observed only scar tissue from a cautery performed at the clinic and no visible vessels, scabs, or scratching."  Ashby Decl. ¶ 11, Dkt. No. 18-4 at 4.  The reference to the "cautery performed at the clinic" is not explained by the parties.  It seems to imply that at some earlier point in time Plaintiff had been treated with nasal cauterization, which was also the treatment he ultimately received on October 15, 2020.  *See infra.*

As a result of his October 7, 2020 evaluation, Defendant changed the referral he had made on September 22, 2020 "to make it an urgent consultation to be scheduled in the next two weeks because of [Plaintiff]'s concerns."  Ashby Decl. ¶ 11, Dkt. No. 18-4 at 4.  Defendant's request for urgent specialist care was approved on October 8, 2020.  *Id.*; Feinberg Decl. ¶ 31, Dkt. No. 18-6 at 8.

On October 15, 2020,[6] Plaintiff was seen by an off-site ear, nose, and throat specialist (otolaryngologist), Dr. Murton, at Twin Cities Community Hospital.  Maldonado Dep. at 84-86, Dkt. No. 18-3 at 27-29.  Dr. Murton did an endoscopic examination which located an eschar (dry and dead tissue).  Ashby Decl. ¶ 12, Dkt. No. 18-4 at 4.  After the eschar was removed, there was bleeding from a vessel that had apparently been underneath.  *Id.*  Dr. Murton cauterized "an area in [Plaintiff's] right nasal cavity that he felt was likely the source of the bleeding episodes."  Feinberg Decl. ¶ 32, Dkt. No. 18-6 at 8; *see also* Dkt. No. 1 at 5 ¶ 7; Dkt. No. 18-3 at 40.  Dr. Murton did not recommend follow-up unless Plaintiff continued to experience nosebleeds.  Feinberg Decl. ¶ 32, Dkt. No. 18-6 at 8.  Dr. Murton's cauterization treatment was effective to end Plaintiff's nosebleeds.  Dkt. No. 1 at 5 ¶ 7.

---

[6] Plaintiff's complaint alleges this event occurred on October 16, 2020.  Dkt. No. 1 at 5 ¶ 7. At deposition, Plaintiff agreed that the correct date is October 15, 2020.  Maldonado Dep. at 84-86, and Ex. K, Dkt. No. 18-3 at 27-29, 40.

United States District Court
Northern District of California

Defendant saw Plaintiff for a follow-up on October 20, 2020.  Ashby Decl. ¶ 13, Dkt. No. 18-4 at 4.  Defendant observed that Plaintiff's "right nostrils and nasal passages were clean and dry, and he had no visible vessels, crusts, or scabs."  *Id.*  Defendant subsequently examined Plaintiff on March 30, 2021 and June 28, 2021.  Feinberg Decl. ¶¶ 34-35, Dkt. No. 18-6 at 8-9.  Plaintiff reported no further bleeding episodes after the treatment he received October 15, 2020, *id.* at ¶ 34, and Defendant noted the epistaxis was resolved as of June 28, 2021.  *Id.* at ¶ 35.

## II.    <u>Summary Judgment</u>

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id*. at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may

United States District Court
Northern District of California

be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp*., 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; see, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001). The court's obligation to view evidence in the light most favorable to the non-movant does not require it to ignore undisputed evidence produced by the movant. *L.F. v. Lake Washington School District*, 947 F.3d 621, 625 (9th Cir. 2020).

Courts "may not simply accept what may be self-serving account by the police officer," especially in light of contrary evidence. *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see id.* (finding summary judgment inappropriate when officer's testimony that a knife-wielding suspect was trying to get up after being shot at 18 times, with 9 of those shots at close range while the suspect was lying on the ground, was contradicted by the video which did not show the suspect trying to get up). "When opposing parties tell different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders); *see Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (in ERISA case where the issue was whether plaintiff had actual knowledge of an alleged fiduciary breach, the court indicated that plaintiff's denial of knowledge could be discredited at summary judgment stage if it was blatantly contradicted by electronic records showing plaintiff viewed a website containing relevant disclosures of investment decisions); *cf. Hughes v. Rodriguez*, 31 F.4th 1211, 1219 (9th Cir. 2022) (district court erred in disregarding all of plaintiff's testimony where bodycam footage of arrest blatantly contradicted some but not all of the testimony; video did not depict whether plaintiff was punched <u>after</u> he was handcuffed, and panel majority found audio of the arrest was also unclear as to the sequence); *Orn v. City of Tacoma*, 949 F.3d 1167, 1171-73, 1178-79 (9th Cir. 2020) (officer not entitled to summary judgment based on qualified immunity when nothing in the record blatantly contradicted plaintiff's account of events, including fact that police officer was never in path of plaintiff's vehicle and officer fired into plaintiff's vehicle as it moved away from officer, which is inconsistent with officer's assertion that he was standing in path of vehicle speeding toward him; based on these disputed facts, it was for jury to decide whether or not to believe officer's testimony regarding claimed fear for his and others' safety); *id.* at 1175 (tire track left at scene showing plaintiff "must have accelerated *before* being shot" and unidentified palm print on passenger side of plaintiff's vehicle in area where officer allegedly "placed his hands to brace for impact" were "nowhere near conclusive enough to meet *Scott*'s 'blatantly contradicts' standard, where the [Supreme] Court relied on a videotape clearly depicting the events in question"); *Cruz*

14

1    *v. City of Anaheim*, 765 F. 3d 1076, 1080 (9th Cir. 2014) (police officers not entitled to

2    summary judgment in a fatal shooting which involved "curious and material factual

3    discrepancies," including the fact that the victim did not have a gun on him and was still

4    suspended by his seat belt when he was shot, which is inconsistent with the officers'

5    assertion that they saw the victim reach for a gun; based on these disputed facts, it was for

6    a jury to decide whether or not to believe the testimony of the four shooting officers and to

7    consider other circumstantial evidence that would tend to discredit their version of events).

8         The Ninth Circuit has held that pro se inmates are exempted from the rule which

9    provides that non-prisoner pro se litigants must comply strictly with the summary

10   judgment rules.  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).  "We have,

11   therefore, held consistently that courts should construe liberally motion papers and

12   pleadings filed by *pro se* inmates and should avoid applying summary judgment rules

13   strictly." *Id.*  While *Ponder* relieves pro se inmates from strict compliance with summary

14   judgment rules, it does not entirely release them from any obligation to identify or submit

15   at least some competent evidence in support of their claim.  *Soto v. Sweetman*, 882 F.3d

16   865, 873 (9th Cir. 2018) (plaintiff not entitled to equitable tolling because he failed to

17   include any allegations in his complaint that he could not proceed with grievance process

18   until after an investigation was completed; he failed to submit any declaration, affidavit or

19   other competent evidence in his opposition to summary judgment; and first raised the issue

20   in response to the district court's show cause order).

21        Conclusory statements, such as that an opponent is lying or that documents have

22   been fabricated – without presentation of any explanation of what portion of a statement or

23   document is false and without offering an explanation of one's view of the true state of

24   events – are insufficient to raise a triable issue.  "When the nonmoving party relies only on

25   its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations

26   unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7

27   F.3d 137, 138 (9th Cir. 1993); *see, e.g., United States v. 1 Parcel of Real Property*, 904

28

F.2d 487, 489, 492 & n.3 (9th Cir. 1990) (claimant "offered a detailed declaration painting a picture entirely different from that described by the government" regarding how a drug transaction had not involved the house; had his declaration only "set forth conclusory allegations, this case would be different" because conclusory allegations do not raise a triable issue).

### A.   <u>Deliberate Indifference to Serious Medical Needs</u>

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment.  *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  *Id.*  If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth

16

Amendment, no matter how severe the risk.  *Gibson*, 290 F.3d at 1188.

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  *See McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  Additionally, the defendant's actions must be the cause of the injury suffered by the plaintiff.  *Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2010), *reinstated as modified by* 658 F.3d 897 (9th Cir. 2011); *see id.* at 1098-1102 (reversing grant of summary judgment to transporting police officers where children of pre-trial detainee who committed suicide presented evidence that transporting police officers (a) were subjectively aware the decedent was at acute risk of harm (suicide); (b) failed to respond properly to that risk by informing jail officials; and (c) such failure was both the actual and proximate cause of the decedent's suicide once at the jail).  A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, but the existence of serious harm tends to support an inmate's deliberate indifference claims, *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin*, 974 at 1060).

The deliberate indifference standard does not require a showing that the prison official acted with an improper motive, such as an intent to harm; it is enough that the official acted or failed to act despite knowledge of a substantial risk of serious harm. *Edmo v. Corizon*, 935 F.3d 757, 793 (9th Cir. 2019), *reh'g en banc denied by* 949 F.3d 489 (9th Cir. 2020) (prison doctor exhibited deliberate indifference when he knew of and disregarded an excessive risk to plaintiff's health by rejecting her request for GCS and then never re-evaluating his decision despite evidence that plaintiff continued to suffer clinically significant distress even though he provided other treatment to plaintiff).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the

doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058.

A failure to provide treatment because administrative reasons prevented a prisoner from being sent to a non-contracted facility would be a failure to provide treatment for non-medical reasons, which is sufficient to generate a genuine issue of material fact as to deliberate indifference on the part of the doctor failing to treat the patient. *Jett*, 439 F.3d 1097. In deciding whether there has been deliberate indifference to an inmate's serious medical needs, the court need not defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989).

### B.  <u>Analysis</u>

With regard to the first element for an Eighth Amendment claim, Defendant does not dispute that Plaintiff's nosebleeds "may arguably qualify as a serious medical need." Dkt. No. 18 at 12; *see also Prescott v. United States*, 2:20-cv-2740-SB (SK), 2022 WL 1051081 *3 (C.D. Cal. Mar. 7, 2022) ("Chronic nosebleeds and nasal infections requiring surgery constitute serious medical needs at the complaint stage." (citing district court cases in Eastern District of California, Northern District of Alabama, and Eastern District of Pennsylvania)); *see also id.* (medical records in discovery may refute an allegation that nosebleeds are a serious medical condition). Accordingly, the Court will assume for the purpose of this summary judgment motion that Plaintiff's epistaxis constitutes a serious medical need.

Rather, Defendant asserts that Plaintiff has failed to establish the second element, *i.e.*, that Defendant acted with deliberate indifference to Plaintiff's medical needs. Dkt. No. 18 at 11, 13. Defendant asserts there is no evidence that he provided medically unacceptable treatment and that he chose a course of treatment in conscious disregard of an excessive risk to Plaintiff's health. *Id.* at 14. Defendant asserts that the undisputed evidence shows that he regularly evaluated and treated Plaintiff between April and October

2020, for his nosebleeds. *Id.* at 12. Defendant asserts that he provided lubricants and nasal spray, as well as referring him to outside facilities twice for further treatment. *Id.* Furthermore, Defendant asserts that Dr. Feinberg opined that Plaintiff was offered timely, adequate, and appropriate medical attention and care and that Defendant's course of treatment was medically acceptable. *Id.*at 14. Lastly, Defendant asserts that Plaintiff's disagreement with Defendant's treatment amounts to nothing more than a difference of opinion which is not sufficient to establish deliberate indifference. *Id.* at 12.

In opposition, Plaintiff asserts that he was "at the mercy of" Defendant who failed to provide adequate medical treatment. Dkt. No. 25 at 2. Plaintiff asserts Defendant failed to identify the source of Plaintiff's bleeding and to make a referral to a specialist when requested, which indicates deliberate indifference. *Id.* Plaintiff asserts that the evidence shows Defendant ignored Plaintiff's medical requests on several occasions and that the treatment he provided, e.g., to drink a lot of water, was inadequate. *Id.* at 6-7. Lastly, Plaintiff asserts that the evidence shows that the treatment he received from custody staff was different from Defendant, which indicates that another reasonable doctor would have treated his condition differently. *Id.* at 7.

In reply, Defendant asserts that Plaintiff's opposition merely contests the treatment he received and contends that Defendant should have made an early referral to a specialist. Dkt. No. 28 at 3. Defendant asserts that the evidence shows he saw Plaintiff on six occasions between April and October 2020, and provided treatment for his recurrent epistaxis, including: examining and evaluating Plaintiff, sending him to NMC for treatment, discussing methods to utilize if the bleeding reoccurred, providing lubricants and nasal sprays, and requesting a referral to a specialist, which he later changed to an urgent consultation due to Plaintiff's concerns. *Id.* Defendant asserts that the undisputed evidence fails to show that his course of treatment was medically acceptable under the circumstances. *Id.* at 4.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds

Defendant has shown there exist no genuine dispute as to any material fact relating to Plaintiff's deliberate indifference claim against Defendant Ashby.  The undisputed facts show that Defendant treated Plaintiff on April 23, 2020, when he gave transport orders for Plaintiff to be taken to NMC and then confirmed over the phone that NMC would accept the transfer.  *See supra* at 4.  This action does not amount to deliberate indifference on the part of Defendant.  The medical records also show that Plaintiff made no further documented complaints of a nosebleed until August 4, 2020, when he complained of back pain and "sometimes" having a bloody nose which he wanted checked.  *Id.* at 7.  Defendant was first informed about Plaintiff's reoccurring nose bleeds after a nurse examined Plaintiff on August 17, 2020.  *Id.* at 8.  Defendant promptly ordered tests and requested Plaintiff be scheduled for an in-person visit within 14 days.  *Id.*  The test results showed Plaintiff did not have anemia, which Defendant reported to Plaintiff on August 19, 2020.  *Id.*  Defendant next saw Plaintiff on September 1, 2020, when he examined Plaintiff and found dry airways; he instructed Plaintiff to apply lubricants, avoid certain breathing techniques, and to avoid nasal sprays.  *Id.* at 9.  Defendant then saw Plaintiff on September 22, 2020, and after an examination, prescribed treatment, this time nasal spray.  *Id.* at 9-10.  Defendant also made a referral to a specialist, which was approved on September 24, 2020.  *Id.* at 10.  Defendant saw Plaintiff next on October 7, 2020, when Plaintiff reported that he had a nosebleed at night which he was able to control.  *Id.*  In response to Plaintiff's concerns at this appointment, Defendant changed his original specialist referral to an urgent consultation, which resulted in Plaintiff seeing a specialist on October 15, 2020.  *Id.* at 11.  The specialist cauterized an area of Plaintiff's right nasal cavity which was effective to end the nosebleeds.  *Id.*  Defendant had a follow-up with Plaintiff on October 20, 2020, and observed no abnormalities.  *Id.*  Plaintiff thereafter reported no further nosebleeds during subsequent exams in March and June 2021; Defendant noted the epistaxis was resolved as of June 28, 2021.  *Id.* at 11-12.  Based on these actions by Defendant in treating Plaintiff's reported complaints, it cannot be said that Defendant acted with

20

deliberate indifference in treating Plaintiff's epistaxis.

    In opposition, Plaintiff must show that there remain disputed facts that create genuine issues for trial. *Celotex Corp.*, 477 U.S. at 324. He has failed to do so. While there are some disputes over the facts, none of them are material to the issue of whether Defendant responded adequately to Plaintiff's medical needs. In his deposition and opposition, Plaintiff repeatedly responded to the detailed medical records submitted by Defendant with conclusory denials and undocumented contradictions of the information contained (or not contained) in the medical records. First of all, Plaintiff asserts that the first time he consulted with Defendant for his nosebleed was in person on March 30, 2020, when Defendant allegedly provided inadequate treatment. *See supra* at 3. However, Defendant has no recollection of such a visit, the medical records contain no record of a visit on March 30, 2020, and Plaintiff fails to produce any documentation to support this allegation. *Id.* On the other hand, his medical records show that Plaintiff first presented with a nosebleed on April 23, 2020, when custodial staff took him to the TTA, and a nurse informed Defendant about Plaintiff's condition for the first time. *See supra* at 3. Accordingly, the Court should not simply adopt Plaintiff's unsupported and self-serving version of events where there is contrary evidence. *See Scott*, 550 U.S. at 380-83; *Zion*, 874 F.3d at 1076.

    Furthermore, Plaintiff denies that it was Defendant who gave the order to transfer him to NMC, but his mere allegation is once again blatantly contradicted by the medical records which show that Defendant was the one who gave the order. Dkt. No. 18-4 at 2 ¶ 5; Dkt. No. 18-6 at 4 ¶ 10. Furthermore, contrary to Plaintiff's assertion that he continued to experience nosebleeds between May 4, 2020 and August 4, 2020, his medical records contain no report of any incidents of nosebleeds. Rather, the records show that Plaintiff reported to a nurse that he had no further nosebleeds as of April 24, 2020, and then no further reports as of April 28, 2020. Dkt. No. 18-3 at 38; Dkt. No. 18-6 at 4 ¶¶ 12-13. Furthermore, the record of his visit with Defendant on May 4, 2020, shows that Plaintiff

United States District Court
Northern District of California

reported his nosebleeds had stopped.  Dkt. No. 18-6 at 3 ¶ 7.  Plaintiff's declaration that he made "several request[s]" to see Defendant and/or that he did not call for medical attention because his nosebleeds were happening at night and/or that he had several appointments with Defendant during the period from May to September 2020, Dkt. No. 25 at 13-14 ¶¶ 7-9, are in blatant contradiction to Plaintiff's medical records.  The medical records document consistent, prompt response to Plaintiff's actual requests for medical attention, yet show no such requests from Plaintiff from May 4, 2020 until August 4, 2020; nor does Plaintiff produce any copies of such requests to indicate that the records are incomplete.  Accordingly, Plaintiff's declaration is insufficient to create a triable issue of fact regarding Defendant's alleged deliberate indifference from May 4, 2020 to August 4, 2020.

The declaration of Plaintiff's cellmate (Rivas) likewise does not create a triable issue of fact.  *See supra* at 6.  Rivas claims generally to have observed Plaintiff having nosebleeds during March through August 2020, but does not attest to whether Plaintiff did or did not request or received medical attention, or Defendant's response to Plaintiff's medical need.  *Id.*  Moreover, even if it were true that Plaintiff did experience nosebleeds during this time and sought medical attention, there is no other evidence that Defendant was made aware of such requests, that he believed a substantial risk of serious harm existed during this time, and that he failed to take reasonable steps to abate it.  *See Farmer*, 511 U.S. at 837.  Accordingly, Plaintiff has failed to demonstrate a triable issue regarding Defendant's treatment for Plaintiff's condition between May 4, 2020 and August 4, 2020.  *See Farmer*, 511 U.S. at 837.

The undisputed evidence shows that when Plaintiff began seeking treatment again for nosebleeds in August 2020, he received a response to each of his requests from various medical providers, including Defendant, various nurses, and an on-call physician (Dr. Grotke).  Defendant ordered blood tests and Dr. Grotke ordered additional blood tests.  *See supra* at 7-8.  Although Plaintiff denies that Defendant personally examined him at a September 1, 2020 visit, once again the medical records show that Defendant did conduct

an examination and that he gave instructions to address the nosebleeds. *Id.* at 9. Lastly, although Plaintiff contends that Defendant failed to make a referral to a specialist after his September 22, 2020 visit, the medical records indicate that Defendant did make the referral at that time and that it was approved by a supervisor on September 24, 2020. *Id.* at 10.

Plaintiff's final argument that a referral should have been made at some earlier point in time does not create a triable issue of fact. Rather, it is merely a difference of opinion between Plaintiff and Defendant regarding the course of treatment, which does not give rise to a § 1983 claim. *See Franklin*, 662 F.2d at 1344. Furthermore, Defendant has submitted evidence showing that his chosen course of treatment was medically acceptable. In response, Plaintiff asserts that the treatment he received from custody staff was different from Defendant, asserting that this is an indication that another reasonable doctor would have treated his condition differently. However, this argument is based on Plaintiff's mistaken belief that it was custody staff who ordered his transfer to NMC, and not Defendant. *See supra* at 3-4. Accordingly, Plaintiff has failed to show that Defendant's chosen course of treatment was medically unacceptable, or that Defendant chose the course in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058.

Based on the evidence presented, Defendant has demonstrated the absence of a genuine issue of material fact with respect to Plaintiff's Eighth Amendment claim against him. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Because no reasonable fact finder could conclude that Defendant acted with deliberate indifference with respect to Plaintiff's serious medical needs, Defendant is entitled to judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323.

**B.     Remaining Defenses**

Defendant asserts in the alternative that he is entitled to qualified immunity from

23

liability for civil damages.  Dkt. No. 18 at 14-16.  Because the Court will grant summary judgment on Plaintiff's Eighth Amendment claims against Defendant on other grounds as discussed above, the Court does not reach Defendant's qualified immunity argument.  For the same reason, the Court need not reach Defendant's alternative argument that Plaintiff is not entitled to punitive damages.  Dkt. No. 18 at 16-17.

## CONCLUSION

For the reasons stated above, Defendant Dr. Johnathan Ashby's motion for summary judgment is **GRANTED**.  Dkt. No. 18.  Plaintiff's Eighth Amendment claim against Defendant Dr. Ashby is **DISMISSED** with prejudice.

This order terminates Docket No. 18.

**IT IS SO ORDERED.**

Dated:  ___May 31, 2023_____

BETH LABSON FREEMAN
United States District Judge

Order Granting MSJ
PRO-SE\BLF\CR.21\07780Maldonado_grant-msj

United States District Court
Northern District of California

24